### United States District Court
### District of Massachusetts

```
─────────────────────────────
                              )
WILLIAM P. ISHAM, IRON WORKERS )
DISTRICT COUNCIL, SOUTHERN OHIO )
& VICINITY PENSION TRUST and  )
OPERATING ENGINEERS CONSTRUCTION )   Civil Action No.
INDUSTRY AND MISCELLANEOUS    )   08-11449-NMG
PENSION FUND,                 )
          Plaintiffs,         )
                              )
          v.                  )
                              )
PERINI CORP., RONALD N. TUTOR, )
ROBERT BAND, MICHAEL E. CISKEY )
and KENNETH R. BURK,          )
          Defendants.         )
─────────────────────────────
```

### MEMORANDUM & ORDER

**GORTON, J.**

This putative class action by the plaintiff shareholders alleges securities fraud by the corporate defendant and several of its officers. Plaintiffs assert claims for violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against all defendants. They also assert claims of control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the individual defendants. Before the Court are defendants' motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), 9(b) and the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4(b).

## I.    **Factual Background**

Plaintiffs, William P. Isham ("Isham"), Iron Workers District Council, Southern Ohio & Vicinity Pension Trust ("Iron Workers") and Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Operating Engineers") (collectively "Plaintiffs") were, at one time, shareholders in the defendant Perini Corporation ("Perini").  Perini is a general contracting and construction management company that focuses on large, complex projects in the hospitality and gaming, sports and entertainment, educational, corrections, biotech and other markets.  Perini is based in Framingham, Massachusetts and its stock is listed on the New York Stock Exchange.

The defendants Ronald Tutor ("Tutor"), Robert Band ("Band"), Michael Ciskey ("Ciskey") and Kenneth Burk ("Burk") (together "the Individual Defendants") are officers of Perini.  According to the complaint, the Individual Defendants hold (or held) the following positions: Tutor is Chairman and Chief Executive Officer ("CEO"), Band is President and Chief Operating Officer ("COO"), Ciskey was Vice President and Chief Financial Officer ("CFO") and is now Senior Vice President and Burk is currently Senior Vice President and CFO.

**A.    The Cosmopolitan Project**

This case arises from Perini's involvement with the Cosmopolitan Project ("the Cosmopolitan"), a hotel and casino currently under construction in Las Vegas, Nevada.  Plaintiffs allege that in 2005, Perini signed a $1 billion construction contract with the developer of the Cosmopolitan, a group called 3700 Associates led by Ian Bruce Eichner ("Eichner"), Deutsche Bank and Global Hyatt.

According to the complaint, Eichner began to experience financial difficulties in late 2006 and early 2007.  Perini allegedly became aware of those difficulties in May, 2007 (the start of the proposed class period) and Eichner's efforts to secure financing became a usual topic of conversation at Cosmopolitan staff meetings thereafter.  According to a confidential informant ("CI 3"), Travis Burton ("Burton"), Perini's Vice President of Operations, was present at those meetings.  Plaintiffs allege that one such meeting in May, 2007, was held to "ease employees' concerns about financing."  At another impromptu meeting held shortly thereafter it was announced that Eichner had to raise an additional $150 million to appease his lender, Deutsche Bank.  A Senior Controller for the Cosmopolitan Project allegedly acted as if "all hell was going to break loose" if the additional financing was not secured.

The complaint also alleges, based on the observations of

-3-

another confidential informant ("CI 2"), that during the summer
of 2007, subcontractors were being paid at a slower rate than
usual.  CI 3 also observed that subcontractors were constantly
concerned about being paid for their work, thus further
suggesting that the Cosmopolitan was in trouble.

According to another confidential informant ("CI 1") the
topic of foreclosure was first broached around the Cosmopolitan
office in October or November, 2007.  Around that same time
Perini Building Company ("PBC"), a subsidiary of Perini
responsible for construction of the Cosmopolitan, sent a letter
to Deutsche Bank seeking a payment guarantee for its work.
According to CI 3, PBC told its employees to "keep building and
keep billing" in an effort to keep Deutsche Bank from shutting
down the project.

Unable to raise the requisite equity, Eichner defaulted on
his loan from Deutsche Bank on January 15, 2008.  Perini
announced the default two days later ("the Corrective Statement")
and its stock price fell from $37.70 to $27.65 per share, or 27%.
On January 18, 2008, the day after issuing the Corrective
Statement, Perini announced that it had entered into an interim
commitment with Deutsche Bank whereby the bank agreed to pay for
the ongoing construction while issues related to Eichner's
default were resolved.  Deutsche Bank eventually took over the
project from Eichner and expects to complete the Cosmopolitan by

late 2009 or 2010.

### B.    Defendants' Alleged Misleading Statements

Plaintiffs contend that the defendants committed securities fraud by making a number of false or materially misleading statements about the Cosmopolitan while they knew that Eichner was experiencing financial difficulties.  Specifically, the Plaintiffs allege that the following statements were materially false and misleading:

1)    A Perini press release issued on May 8, 2007, and statements made by defendant Band, indicating that the company anticipated record revenues and earnings per share for 2007;

2)    defendant Band's statements, made during a conference call shortly after the May 8th release, that the gaming and hospitality markets remained strong and that the Cosmopolitan remained on track for completion;

3)    a Perini press releases issued on August 7, 2007, and statements made by defendant Band, indicating that the company continued to anticipate record revenues and earnings per share for 2007;

4)    defendant Band's statements, made during a conference call shortly after the August 7th release, that Perini continued to convert its construction backlog into revenue, that there was an active pipeline for new projects in the Las Vegas market and that the Cosmopolitan project remained on track for completion in mid-2009;

5)    PBC Vice-Chairman Dick Rizzo's response to an analyst's question during the conference call following the August 7th release, in which he stated that he was not aware of any gaming projects that have been delayed or canceled because of financing problems;

6)    a Perini press releases issued on November 8, 2007, and statements made by defendant Band, indicating that Perini was predicting an increase in its projected

revenue and earnings per share; and

7)    Defendant Band's statements, made during a conference call shortly after the November 8th release, that Perini continued to convert its construction backlog into revenue, that, despite worsening credit markets, Perini had not seen an impact on its hospitality and gaming projects currently under construction and that the Cosmopolitan remained on track for completion.

Plaintiffs maintain that all of the above statements were materially false or misleading because the defendants failed to disclose that 1) the developer of the Cosmopolitan was experiencing financial difficulties and at risk of defaulting on his loans, 2) as a result of those difficulties the project could be halted, 3) subcontractors on the Cosmopolitan were being paid at a slower rate than at other Perini projects, 4) down payments on condominiums in the Cosmopolitan might be refunded if the project was halted and 5) the risk of delay on the Cosmopolitan, which represented 20% of Perini's construction backlog, made the company's revenue and profit projections unrealistic.

## C.    Allegations of Insider Trading

The complaint also alleges that certain Individual Defendants and other corporate insiders not named as defendants engaged in insider trading during the class period. Specifically, it alleges that defendants Tutor and Band engaged in "unusual and suspicious" insider trading. During the relevant time period Band allegedly sold 74,800 shares for a total of $4,373,378. Those sales represented over 75% of his total

holdings in Perini.  Defendant Tutor allegedly sold 2,469,229 shares during the same time period for a total of $131,059,951. Those sales represented 100% of his holdings in Perini. Furthermore, the complaint alleges that three directors and the president of PBC (also former Chairman and CEO of Perini) engaged in insider trading, although none is named as a defendant.

## II.  **Procedural History**

Plaintiff Isham filed this putative class action against the defendants on August 20, 2008.  On December 12, 2008, this Court granted a motion to consolidate the case with a subsequently filed complaint, appointed Iron Workers and Operating Engineers as co-lead Plaintiffs and appointed Coughlin, Stoia, Geller, Rudman and Robbins as lead counsel.  A consolidated amended complaint was filed on February 9, 2009.

Defendants, after obtaining leave to file an over-long memorandum, filed the pending motions to dismiss on April 17, 2009.  Plaintiffs filed a 48-page opposition to both motions on June 5, 2009 and defendants filed replies on July 10, 2009.  On September 25, 2009, the Court held a hearing on the motions.

## III. **Motion to Dismiss**

### A.   **Legal Standards**

In order to survive a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above

the speculative level." <u>Bell Atl. Corp.</u> v. <u>Twombly</u>, 550 U.S. 544, 555 (2007).  In considering the merits of a motion to dismiss, the court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken.  <u>Nollet</u> v. <u>Justices of the Trial Court of Mass.</u>, 83 F. Supp. 2d 204, 208 (D. Mass. 2000) <u>aff'd</u>, 248 F.3d 1127 (1st Cir. 2000).  Furthermore, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  <u>Langadinos</u> v. <u>Am. Airlines, Inc.</u>, 199 F.3d 68, 69 (1st Cir. 2000).  If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied.  See <u>Nollet</u>, 83 F. Supp. 2d at 208.

A claim for securities fraud must also comply with Fed. R. Civ. P. 9(b) and satisfy the exacting requirements of the PSLRA. <u>See</u> Fed. R. Civ. P. 9(b) (allegations of fraud must be stated with particularity); 15 U.S.C. § 78u-4(b)(2) (complaint must "state with particularity facts giving rise to a strong inference" of scienter); <u>see also</u> <u>Tellabs, Inc.</u> v. <u>Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 313 (2007) (noting the "[e]xacting pleading requirements" of the PSLRA).

### B.    Section 10(b) and Rule 10b-5 Liability

Plaintiffs bring claims for violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Perini and the Individual Defendants.  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative device or contrivance."  15 U.S.C. § 78j(b).  Rule 10b-5 similarly makes it unlawful:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ....

17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5 a plaintiff must adequately plead six elements:

> (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

### 1.    Scienter

The Court turns first to the allegations of scienter.  "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'"  ACA, 512 F.3d at 58 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  It requires a showing that the defendant acted with "either conscious intent to defraud or a high degree of recklessness."  Id. (internal

quotation marks omitted).  Under the PSLRA, plaintiffs must
"state with particularity facts giving rise to a strong inference
that the defendant acted with the requisite state of mind."  15
U.S.C. § 78u-4(b)(2).  The Supreme Court has instructed that, to
qualify as strong, "an inference of scienter must be more than
merely plausible or reasonable — it must be cogent and at least
as compelling as any opposing inference of nonfraudulent intent."
Tellabs, 551 U.S. at 314.

    "Knowingly omitting material information is probative,
although not determinative, of scienter."   Miss. Pub. Employees'
Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 87 (1st Cir.
2008).  "[G]eneral inferences that the defendants, by virtue of
their position within the company, 'must have known' about the
company's problems" are insufficient.  See Lirette v. Shiva
Corp., 27 F. Supp. 2d 268, 283 (D. Mass. 1998) (citing Maldonado
v. Dominguez, 137 F.3d 1, 9 (1st Cir. 1998)).  As another session
of this court has explained:

> A 10b-5 plaintiff must allege details of defendants'
> alleged fraudulent involvement, including specifics as
> to what defendants had knowledge of and when.  To
> satisfy this requirement, complaints typically identify
> internal reports, memoranda, or the like, and allege
> both the contents of those documents and defendants'
> possession of them at the relevant time.

In re Boston Tech., Inc. Sec. Litig., 8 F. Supp. 2d 43, 57 (D.
Mass. 1998) (citations and internal quotation marks, footnote and
brackets omitted); see also id. at 57 n.17 (noting that

-10-

allegations of a meeting at which relevant subject matter was discussed could suffice to prove knowledge).  Nor are "general allusions to unspecified internal corporate information" or documents sufficient to show scienter.  Lirette, 27 F. Supp. 2d at 283; see also Carney v. Cambridge Tech. Partners, Inc., 135 F. Supp. 2d 235, 255 (D. Mass. 2001).

Here, Plaintiffs summarize their scienter allegations as follows:

> 1) Perini personnel were "both aware of and concerned about" Eichner's financing difficulties and their potential impact on the Cosmopolitan Project and Perini; 2) Perini personnel "took active steps to try to avoid any negative impact to Perini's interests" from those problems; 3) the Individual Defendants "were in a position to know all the relevant facts"; and 4) certain of the Individual Defendants and other insiders engaged in "a massive sell-off" of Perini stock.

The Court considers the allegations in turn.

### a.  Awareness and concern about Eichner's financing problems and their impact on Perini

Again, allegations of knowledge of material omissions are merely probative, not determinative, of scienter.  Boston Scientific Corp., 523 F.3d at 87.  The crux of Plaintiffs' case, repeated at oral argument, is that defendants knew about Eichner's troubles which rendered statements that, in essence, all was well at Perini, false and misleading.  Actionable scienter, however, requires a strong inference of "either conscious intent to defraud or a high degree of recklessness." ACA, 512 F.3d at 58.

-11-

Even assuming that defendants possessed knowledge of Eichner's problems, the complaint fails to attribute the requisite high level of culpability to them.  To the contrary, the complaint sets forth facts showing that defendants were actively, and ultimately successfully, working to ensure that any difficulties of Eichner's did not impact Perini.  Indeed, as soon as Eichner defaulted, Perini disclosed it and followed up with a statement that the Cosmopolitan project would not be affected. Prior to the default, however, defendants concentrated on preventing any adverse impact on the company rather than disclosing a list of possibilities (i.e., that one of its investors <u>might</u> default on a loan which <u>might</u> delay the project).

To evaluate scienter, fraudulent and non-fraudulent inferences from defendants' alleged knowledge of Eichner's prospective problems must be weighed.  <u>Tellabs</u>, 551 U.S. at 314. At least two non-fraudulent inferences stand out: 1) that defendants were simply acting as prudent fiduciaries and businessmen and 2) that defendants did not report the information before default because any potential impact on Perini was too attenuated (and ultimately nonexistent).  Those inferences are, in the Court's opinion, more compelling than any inference of culpable scienter.

Because the non-fraudulent inferences have more appeal, the opinion in <u>Boston Scientific</u>, relied upon heavily by Plaintiffs,

-12-

is inapposite.  That case concerned patient problems with a coronary stent and subsequent recalls.  Plaintiffs alleged, with substantial support on the record, that defendants had known about a connection between a manufacturing change and patient problems before the change was disclosed, rendering certain statements made after implementation of the change false or misleading.  Likewise, they alleged that when the COO declared the stent problem "fixed" he knew that another recall was imminent.  The First Circuit Court of Appeals found those inferences at least as strong as those in opposition.  See Boston Scientific Corp., 523 F.3d at 86-92.  Here, by contrast, plaintiffs do not allege that defendants knew of any events as definitive as a manufacturing change or an impending recall.  Instead, they claim that defendants knew of financial difficulties that might have impacted Perini eventually, a critical distinction.

Not only have the Plaintiffs failed to allege the requisite scienter, they have also failed to plead adequately that any of the defendants were even "aware of" Eichner's financing difficulties in the first instance.

### i.    The Individual Defendants

The allegations with respect to the knowledge of the Individual Defendants are precisely those that courts within this circuit routinely find deficient.  The complaint's conclusory statements that those defendants 1) "as senior executive officers

-13-

and/or directors of Perini, were privy to confidential and proprietary information," 2) had access to unspecified "corporate documents" or 3) attended unspecified "management and/or board of directors meetings," fail to give rise to a strong inference of scienter. See Carney, 135 F. Supp. 2d at 255 ("No strong inference of scienter can arise from allegations about sources of information ... that are so vague and general as to invite questions as to the extent to which these sources exist at all."). In addition, there is no allegation that any of the Individual Defendants read or knew about the only specific document referred to, i.e. a letter to Deutsche Bank seeking a payment guarantee.

Nor do allegations elsewhere in the complaint, specifically those based on the observations of confidential informants, meaningfully bolster the inference of scienter. Although the informants allegedly attended meetings at which Eichner's financial difficulties were discussed, there is no allegation that any of the Individual Defendants was present at those meetings or that anyone conveyed to them the information discussed.

Thus, even assuming that being "aware of and concerned about" the information that allegedly rendered Perini's public statements false or misleading is actionable, absent more specific allegations, there can be no strong inference that the Individual Defendants acted with the requisite state of mind.

### ii.  Perini Corporation

With respect to the corporate entity (Perini), Plaintiffs'
pleadings similarly fail to give rise to a strong inference of
scienter regarding awareness of or concern about Eichner's
financial troubles.  "The scienter of corporate entities ... is
ascertained through the mental state of [their] management."
Sec. & Exch. Comm'n v. Durgarian, 477 F. Supp. 2d 342, 357 (D.
Mass. 2007) (internal quotation marks omitted), aff'd on other
grounds, Sec. & Exch. Comm'n v. Papa, 555 F.3d 31 (1st Cir.
2009); see also In re Cabletron Sys., Inc., 311 F.3d 11, 40 (1st
Cir. 2008) ("The scienter alleged against the company's agents is
enough to plead scienter for the company.").

Aside from the Individual Defendants, the complaint
identifies several other Perini employees whose intent
potentially could be imputed to the corporate entity.  First,
Plaintiffs point to PBC employees who attended meetings at which
Eichner's financial difficulties were discussed.  As defendants
respond, however, PBC is a subsidiary of Perini and the intent of
employees at a corporate subsidiary cannot be attributed to the
corporate parent absent grounds for piercing the corporate veil.
See Pugh v. Tribune Co., 521 F.3d 686, 698 (7th Cir. 2008).
Because no such grounds have been presented here, pleadings with
respect to PBC employees do not give rise to a strong inference
of knowledge or scienter that can be imputed to Perini.

The only person identified as a Perini employee having

-15-

knowledge of Eichner's financial difficulties is Burton, whom the complaint describes as Vice President of Operations at Perini. Burton is alleged to have been present at a meeting in May, 2007, ostensibly held to "ease employees' concerns about financing for the [Cosmopolitan] project." That single allegation fails, however, to demonstrate "a mental state embracing intent to deceive, manipulate, or defraud." ACA, 512 F.3d at 58 (internal quotation marks omitted). The complaint does not claim that Burton participated in making, or had any knowledge of, the statements concerning the Cosmopolitan project that are the basis of Plaintiffs' allegations of fraud.

Finally, Plaintiffs' generic allegation of "institutional knowledge" as a basis for scienter is without merit. Although several circuit courts of appeals have noted that it might be possible to draw a strong inference of corporate scienter without identifying the specific individuals who committed the fraud, no such inference can be drawn here. See Makor Issues & Rights, Ltd. v. Tellabs, 513 F.3d 702, 710 (7th Cir. 2008) (explaining that such an inference might be appropriate if General Motors announced that it sold one million sport utility vehicles in a particular year when the actual number was zero); see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195-96 (2d Cir. 2008). In conclusion, an inference that "someone whose scienter is imputable to the corporate defendant ... was at least reckless toward the alleged

-16-

falsity" of Perini's statements is not rendered "at least as compelling" as competing inferences even accounting for a discrepancy between Perini's public statements and the true state of affairs at the Cosmopolitan.  See Dynex, 531 F.3d at 197 (citing Tellabs, 551 U.S. at 314).

Accordingly, the Court concludes that Plaintiffs have not adequately pled that Perini (i.e. responsible officers thereof) possessed the alleged knowledge and therefore could have acted with the intent necessary to sustain a claim for securities fraud.

### b.  Active steps taken to avoid any negative impact to Perini's interests from Eichner's financing difficulties

Plaintiffs also point to "active steps [taken] to try to avoid any negative impact to Perini's interests resulting from Eichner's problems."  Specifically, such steps were 1) a letter from PBC to Deutsche Bank seeking a payment guarantee and 2) PBC managers telling employees "to keep building and keep billing" to dissuade Deutsche Bank from any inclination to shut down the Cosmopolitan.

These allegations do not support a strong inference of scienter.  The Court construes Plaintiffs' position to be that these claims are probative of defendants' knowledge of Eichner's troubles.  As such, they fail for the same reasons identified in the preceding section.  Moreover, the Court is further convinced that such actions were simply earmarks of wise business decisions

-17-

and that therefore, the non-fraudulent inference that defendants acted to protect Perini's interests and keep the project going is more compelling than any inference of fraudulent intent. See Tellabs, 551 U.S. at 314.

### c. Insider sales

Plaintiffs' dependance on their claim of insider trading is equally unavailing. As the First Circuit has held:

> If there is reason to be concerned about material omissions or misrepresentations, the presence of insider trading can be used, in combination with the other evidence, to establish scienter.

N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 55 (1st Cir. 2008). "Insider trading cannot[, however,] establish scienter on its own," Boston Scientific Corp., 523 F.3d at 92, nor can even unusual sales by only one defendant give rise to a strong inference of scienter. N.J. Carpenters, 537 F.3d at 56. Moreover,

> mere pleading of insider trading, without regard to either context or the strength of the inferences to be drawn, is not enough.... It must be unusual, well beyond the normal patterns of trading by those defendants.

Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999).

Here, Plaintiffs have alleged insider trading by Individual Defendants Tutor and Band and by alleged insiders Willard Brittain, Robert Kennedy, Raymond Oneglia and Craig Shaw ("Shaw"). In light of the Court's previous conclusions, these allegations cannot be used to support a strong inference of scienter because "[i]nsider trading cannot establish scienter on

its own." <u>Boston Scientific Corp.</u>, 523 F.3d at 92.

The Court nonetheless briefly considers Plaintiffs' claims and finds that they, "either alone or together with the other allegations" in the complaint, fail to give rise to a strong inference of scienter. <u>Greebel</u>, 194 F.3d at 206.  With respect to Tutor and Band, the complaint does not adequately allege that the sales of either were unusual.  Although Plaintiffs state the percentages of defendants' holdings that were sold, they "provided no information on sales by corporate insiders at times outside the Class period, so there is no comparison point." <u>See</u> <u>id.</u> at 207; <u>Fitzer</u> v. <u>Sec. Dynamics Techs., Inc.</u>, 119 F. Supp. 2d 12, 25 (D. Mass. 2000) (finding no strong inference of scienter where plaintiff presented no information about pre-class period trading practices).

Indeed, as the defendants note, their trades appear much less suspicious when considered in context.[1]  During the six months prior to the class period, for example, Band sold <u>more</u> shares than he did during the nine-month class period and during the nine months preceding the class period, Tutor's sales amounted to 70% of his class-period sales.  For both, trading during the class period can, therefore, hardly be characterized

---

[1] Assertions that Band's trades were made pursuant to a valid 10b5-1 trading plan and that Tutor's trades were apparently made at a time when he planned to go into business for himself would further support this holding but the Court purposefully declines to rely on that evidence with respect to the pending motion.

as "well beyond" normal patterns.  See Greebel, 194 F.3d at 198.

In addition, even if Tutor's sale of 100% of his holdings during

the class period could be deemed to lend support to an allegation

of scienter, with respect to a motion to dismiss "even unusual

sales by one insider do not give rise to a strong inference of

scienter." N.J. Carpenters, 537 F.3d at 56 (quoting Abrams v.

Baker Hughes Inc., 292 F.3d 424, 435 (5th Cir. 2002)).

     The remaining "insider" sales of non-defendants are also

unavailing because, again, insider sales cannot establish

scienter on their own.  To be sure, the complaint also alleges

that Shaw had access to information about financing problems at

the Cosmopolitan.  Allegations of "access" to unspecified

documents or information, however, are also insufficient to

establish scienter.  See Carney, 135 F. Supp. 2d at 255.

Consequently, the complaint fails to give rise to a strong

inference of scienter with respect to those insiders and, thus,

no scienter can be imputed from them to the named defendants.

     Accordingly, the insider sales either alone or together with

other allegations are insufficient to establish a strong

inference of scienter.  The complaint, therefore, is devoid of

any actionable pleading on scienter and will be dismissed.

### 2.  Material Omissions

     Even were this Court to find that Plaintiffs have adequately

alleged scienter for one or more of the defendants, the allegedly

fraudulent statements do not provide a basis for liability.  In

-20-

accordance with the typical analysis in securities fraud cases within this circuit, the Court analyzes the allegedly fraudulent statements separately, grouping together similar statements where helpful.  See Van Ormer v. Aspen Tech., Inc., 145 F. Supp. 2d 101, 106 n.3 (D. Mass. 2000).

### a.    Perini's Forward-Looking Statements

The safe harbor provision of the PSLRA provides immunity for "forward-looking" statements to the extent that, inter alia:

(A) the forward-looking statement is--

> (i)    identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

15 U.S.C. § 78u-5(c)(1).[2]  "Vague or boilerplate disclaimers" are insufficient, In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20, 34 (D. Mass. 2004), and to be meaningful, cautionary statements must be "substantive and tailored to the specific future projections, estimates or opinions ... which plaintiffs challenge."  In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 340 (D. Mass. 2009) (citation omitted).

Defendants assert that statements about anticipated revenue and earnings per share and statements that the Cosmopolitan was

---

[2] Plaintiffs argue that they have adequately pled actual knowledge of falsity but they base that claim on an apparent misinterpretation of the statute which, in another provision, safeguards statements that plaintiff fails to prove were made with actual knowledge of falsity.  15 U.S.C. § 78u-5(c)(1)(B)(i).

"on track" are forward-looking statements entitled to protection under this provision because they were accompanied by meaningful cautionary language.  Plaintiffs respond that the safe harbor does not apply because 1) Perini's cautionary statements were boilerplate and 2) the challenged statements are not forward-looking.  The Court disagrees.

Perini's cautionary statements were not boilerplate but rather "tailored to the specific future projections" Plaintiffs allege were false.  In re Smith & Wesson, 604 F. Supp. 2d at 341 (finding that PSLRA applied where defendant provided similarly detailed cautionary language).  Perini specifically warned of the risks posed by customer cancellations, economic downturns or weakening in the hospitality and gaming market and specifically noted that construction projects could be delayed, suspended or terminated.  It also noted that those risks had the potential to impact revenue, cash flow, earnings and profit.  In particular, the defendants warned that

> These risks and uncertainties include, but are not limited to, the Company's ability to successfully and timely complete construction projects; the Company's ability to convert backlog into revenue; [and] the potential delay, suspension, termination, or reduction in scope of a construction project.

Perini representatives also cautioned investors during analyst conference calls and directed them to its 2006 10-K, which included many similar and detailed caveats.

Plaintiffs' suggestion that the failure to acknowledge

Eichner's financing problems renders these cautionary statements insufficient is unpersuasive.  Nothing in the safe harbor provisions of the PSLRA requires disclosure of such specific risk factors.  In fact, such a requirement would be impractical and the statute's legislative history suggests that such detailed disclosure is unnecessary.  See In re Cytyc Corp., 2005 WL 3801468, at *21 ("[T]he cautionary statement does not necessarily have 'to include the particular factor that ultimately causes the forward-looking statement not to come true.'" (quoting the House Report)).  Although Perini might have foreseen that Eichner's financial difficulties had the potential to affect its projections adversely, this is not a case where the anticipated risks "had actually materialized by the time the challenged statements were made."  See In re Pharm., Inc. Sec. Litig., No. 04-cv-12581 (GAO), 2007 WL 951695, at *15 n.15 (D. Mass. Mar. 28, 2007).

Nor is the Court persuaded that the statements at issue were not "forward-looking."  Assertions that Perini "anticipated" a record year fit comfortably within the PSLRA's definition of forward-looking.  See 15 U.S.C. § 78u-5(i)(1)(A) (defining forward-looking as "a statement containing a projection of revenues, income ... , earnings ... per share, capital expenditures, dividends, capital structure, or other financial items").  Statements that the Cosmopolitan remained "on track" or "on schedule" for completion are likewise forward-looking.  To

the extent that they refer to a current condition of fact, they are indisputably true, as construction on the Cosmopolitan had not then, nor has it since, been delayed.

The Court concludes that statements made by the defendants concerning 1) Perini's anticipated revenue, profit or earnings per share and 2) the Cosmopolitan's projected date of completion fall within the PSLRA's safe harbor provisions and do not form the basis of a claim for securities fraud.

### b.    Statements by PBC Vice-Chairman Rizzo

Plaintiffs allege that statements by PBC's Vice-Chairman Rizzo (who is not a defendant) in an August 7, 2007 conference call were materially misleading.  They point specifically to an exchange with analyst Steven Fisher in which Fisher inquired about the impact of tighter credit markets on gaming projects "just mentioned."  Rizzo responded that he was unaware of any cancellations or delays due to financing problems.  Rizzo's answer is alleged to have been materially misleading because he failed to disclose, <u>inter alia</u>, Eichner's financial difficulties or that the condominium market in Las Vegas was weak.

When viewed in context, however, it is clear that Rizzo's comments were not made with reference to the Cosmopolitan.  The gaming projects "just mentioned" that were the subject of the analyst's inquiry were projects in New York, Pennsylvania and California and two potential projects in Las Vegas (CityCenter 2 and the Frontier).  Because Rizzo's answer was in response to a

-24-

question referring to those projects and not to the Cosmopolitan, it was not rendered misleading by his failure to mention alleged financing problems at the Cosmopolitan.  See 17 C.F.R. § 240.10b-5(b) (requiring disclosure of material facts "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading").

### c.  Statements About the Las Vegas Market

Plaintiffs assert that a number of statements about the strength of the Las Vegas gaming market were rendered materially misleading by Perini's failure to disclose problems associated with construction of the Cosmopolitan.  They point to defendant Band's statements that the Las Vegas gaming market "remain[s] strong," and "is supporting the explosive growth it has experienced over the last few years and there is an active pipeline of new projects."  They also rely upon a statement by Band in a November 8, 2007 conference call about the slowing of the residential construction and credit markets in general and its apparent lack of impact on the hospitality and gaming projects in Perini's backlog.  Defendants respond that those statements were true and not rendered materially misleading by any undisclosed information about Eichner or the Cosmopolitan.

The Court finds that the subject statements are not actionable.  With respect to the general comments about the strong Las Vegas gaming market, plaintiffs fail to meet the

statutory pleading requirements.  Pursuant to 15 U.S.C. § 78u-4(b)(1)(B), the complaint must specify "the reason or reasons why the statement is misleading."  Plaintiffs give no specific reason why failing to mention Eichner's financial issues renders a statement about the entire Las Vegas market misleading.  Indeed, even if Eichner had defaulted and the Cosmopolitan had been negatively impacted (which did not happen), there is no reason to conclude that the statements were false or misleading. Presumably, one endangered project would not overwhelm the entire gaming industry.  In any event, the complaint is devoid of the requisite materiality.[3]

That leaves Band's November 8, 2007 statement, which describes the impact of the economy on Perini specifically. Plaintiffs correctly note that "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors."  Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 175 (1st Cir. 1994).  Band's declaration is not, however, such a statement.  Rather, it simply describes the impact on Perini's business "at th[at] point."  He did not, by contrast, report that no project was affected by the credit crisis nor that any would

---

[3]  The only relevant allegation in the complaint is that defendants should have disclosed that the condo market in Las Vegas was extremely weak.  Defendants are not, however, required to "disclose" public information.  E.g., Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware.").

be in the future.  He simply stated that the crisis had not impacted any project to that point in time.  Band's statement cannot be found misleading whether or not defendants knew about Eichner's purported credit issues.

### 3.    Loss Causation

Defendants also contend that neither Lead Plaintiff can allege loss causation.  Because the Court finds plaintiffs' complaint insufficient with respect to scienter and materiality, it declines to address that issue.

### C.    Section 20(a) Liability

Plaintiffs assert a claim for control person liability pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.  Section 20(a) imposes joint and several liability on any person who "directly or indirectly controls any person liable" under Section 10(b) and Rule 10b-5.  15 U.S.C. § 78t(a).  Because the complaint fails to allege an underlying violation of the federal securities laws, Plaintiffs' Section 20(a) claim must also be dismissed.  See Greebel, 194 F.3d 207.

### IV.  Dismissal without prejudice

The First Circuit Court of Appeals has held that the PSLRA "does [not] require that all dismissals be with prejudice."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 56 (1st Cir. 2008).  Here, although the Court's findings do not rest entirely on pleading deficiencies, it will dismiss the case without prejudice, in an abundance of caution, and allow plaintiffs leave

to amend once more.  See Guerra v. Teradyne Inc., No. 01-cv-11789 (NG), 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004) (allowing leave to amend where it "was the first time a complaint has been substantially reviewed by the court in th[e] case").  The Court, however, makes this ruling with the caveat that if the second amended complaint is deficient, dismissal will then be with prejudice.  See Suna v. Bailey Corp., 107 F.3d 64, 66 (1st Cir. 1997) (affirming dismissal after the district court "'reluctantly grant[ed] plaintiffs leave to file a second amended complaint' ... but cautioned that if 'the second complaint fail[ed] to satisfy the pleading requirements, the action [would] then be dismissed with prejudice'").

**ORDER**

In accordance with the foregoing, the defendants' motions to dismiss (Docket Nos. 29 and 32) are **ALLOWED** but the case is dismissed without prejudice.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated October 7, 2009